Our fourth case for this morning is C.G. Schmidt Incorporated v. Permasteelisa North America. Mr. Levy. Good morning, Your Honors. My name is Josh Levy. I'm here representing C.G. Schmidt. My client's a general contractor. It was preparing to build an office tower in Milwaukee in 2013 when it sent out for bids from subcontractors. It sends out an official bid form that it asks subcontractors to use when submitting their bids. The defendant, the appellee, looked at that form, and being a large company, Permasteelisa had a law department, and they had their law department review that form in detail. Could I ask you, Mr. Levy, which version? There are quite a few versions of what P&A was going to do that come your way. Which version did you rely on? Your Honor, there are several updated bids, and we relied on the May 16, 2014 bid. And that bid is at app 298 and 299. If you look at that bid form, it's very instructive to debunk the defendant's argument that there was a series of negotiations for many months. The original bid was made in April of 2013. But there's so many changes that kept getting made, and there are terms that are under discussion. There are lists of things that need to be done. I don't think it's impossible to write a bid so that it's firm, subject to the conclusion of an agreement between the general contractor and the project owner, for example, or subject to the guaranteed maximum price. I just don't know if you had one, because the price bounces around, the terms bounce around. P&A keeps saying we need a written contract. Your Honor, if I may address all those points. Addressing all those points. First of all, the price did not bounce around. Yeah, it starts out at $12 million and some. But that's with alternates. When you look at a bid form like this, and this is not uncommon in the subcontractor-contractor business, there are different alternates the general contractor can select. And in the testimony, P&A itself says it's not unusual to provide a bid form or a bid that has many different alternates. There's only one real change from the original bid to the May 16th bid. And that's that originally P&A in April bid for the first floor through the 18th floor of the property. Shortly thereafter, they provided an updated bid proposal. And this is extremely significant. So what's your best evidence that CGS ever definitely accepted one particular bid? You tell P&A or Permis de Lisa that they're the contractor of choice, but you don't actually accept. What you do is begin your value engineering, as you call it, which is fine, trying to figure out how you can get the price to a point. And the other thing that bothers me is it seems that you never do pre-qualify Permis de Lisa, which your own instructions say before a bid is considered for award, the bidder has to be pre-qualified. Your Honor, let me answer both those questions. First of all, the bid that was relied upon by May 16th, 2014 was accepted. How? There was a subcontract delivered to Permis de Lisa on June 13th with the numbers from this bid, and that's undisputed. But is it June 13th? Of 2014. Your Honor, there was a series of events that fall squarely within the elements of a stop-off. It's a proposed written contract, but P&A doesn't respond to that. It is a subcontract that C.G. Schmidt testified included the values in the May 16th bid, and it included all of the items that Permis de Lisa requested be put in that bid. Well, no, but I'm not sure it does because Permis de Lisa says it's not going to start shop drawings under the letter of intent because they don't have a contract in place, and they've only gotten answers to two of their ten-some-odd questions. Your Honor, Permis de Lisa provided a bid on May 16th, 2014. That's undisputed. The bid included a full scope of work. The cases, Janke and Cedar, stand for the proposition in the Seventh Circuit that the applicable law is a general contractor, if it induces reliance and it induces reliance to their detriment, has relief and promissory estoppel. That exact bid, May 16th, 2014, was followed by Permis de Lisa's statement to C.G. Schmidt, we can start production to make a March 1st, 2015, installation date if we have a subcontract by July 4th, 2014. Permis de Lisa gave the word. If we have a subcontract. Correct, by July 4th. Doesn't that language suggest to you that there isn't one then yet, if we have one by July 4th? I would say two things, Your Honor. First, if I can go with that May timeframe, and then I'll revert back to the original contract. See, because there are a lot of things that happen from this May 16th timeframe to the June 24th timeframe that you're not really addressing. I mean, a P&A employee learns about the civil unrest, the parties start to discuss the possible start date. Then May 25th, CGS submits a revised letter with the same $7.7 million price, but then there are four new alternates there, and they talk about the mock-up in that. Then May 27th, CGS and the project owner execute a guaranteed max price amendment to the prime contract, and then there's an ability then to execute a formal written contract. Then May 29th, CGS gives P&A the copy of the prime contract. There's a complaint by P&A about the liquidated damages and other provisions, and P&A submits an updated bid with an $8 million. I mean, there's a lot going on in between that and also what happens in June. I'm not going to keep reading all those things, but there are a lot of things happening that show that it's not a firm agreement. Your Honor, there's two claims here. There's the estoppel claim and the agreement claim. On the estoppel claim, all of what the judges are asking in this argument relates to whether the reliance was justifiable by C.G. Schmidt. And the Cedar case and the Janky case clearly say, if I give you a promise, this was a promise on May 16th, to provide this material to C.G. Schmidt for this price. If I give you that promise on that date, and recall Primus DeLisa's representative, John Stanko, said, every updated bid is a new proposal. It's the price in play at that time for those materials at that time. So they gave that to C.G. Schmidt. C.G. Schmidt heard them say they could meet the project schedule and locked in with the owner. Those are the first two elements of promissory estoppel. Now, it's for a fact finder to decide whether there was justifiable reliance by C.G. Schmidt when it locked in with the owner. And that should have happened at a trial. That should not happen on summary judgment. If we could find a lock-in point, I guess I still find this very challenging in light of what Judge Williams is saying, how much was going on. You can't decide if reliance is reasonable until you know what it is you think you're relying on. And it's still pretty fluid. C.G. Schmidt relied on the May 16, 2014 updated bid proposal. There's no dispute to that. In fact, Primus DeLisa doesn't even address that in their response brief. At that time, they had a definite offer. This is as clear as can be to say we'll give you the curtain wall for a price. But then, like, look at June. P&A emails C.G.S. about issues with the subcontract regarding the delay damages, both paying and receiving, and says, and I quote, it would be a good time to start reviewing the scope portion of the contract. And then 6-13, C.G.S. submits a draft of the final contract with the $7.8 million price. Then 6-13, C.G.S. submits a revised final subcontract for $7.7 million. I mean, I can't. Your Honor, that's the Janky case, and that's the Cedar case. In the Cedar case especially, Ross and Plumbing, the plumber, tried to renegotiate their bid after providing the bid. And the court said, no, you're bound by your bid. When you provide that bid, the general contractor can accept that bid. And that's why there was relief granted. Both those cases were after trials. Testimony needs to be heard here. There's a lot of facts there where Primus Lisa asked for things that they were not entitled to ask for. Yeah, but these things I've outlined for you, that's not disputed. This is all about the paper. So that's not disputed, these drafts. And then when we get to 6-24, P&A proposes to manufacture all curtain wall for 8.69, and that's when C.G.S. rejects the order and chooses a replacement supplier. But I'm saying all these dates I've given you are based on documents. They are documents, but just because Primus Lisa puts in a document, we want to back out of our deal, doesn't give them the right to back out of that deal. They knew that they were inducing reliance. They knew that the project was very close to launch. And if you look at the critical document where they said they would need a subcontract, that document, Your Honors, is App 314, App 315. They wrote to C.G. Schmidt and said, We need an executed contract by July 4th. They got that contract on June 13th. They just didn't put their hand to it and execute it. And, Your Honor, there was activity at the end there. This is why it's so important for the industry. Both parties agree, and Primus Delisa admits, that developers don't always go forward with the project. So there's a lot that has to happen after the owner signs the dotted line. We're allowed to rely on their bid before the owner signs on the dotted line. And that's what C.G. Schmidt did. They took that bid, and they locked in for this price with the owner. After they locked in, Primus Delisa can't hold them hostage like you're suggesting, Your Honor. They can't come back June 24th and say, Oh, well, we'll do it for another $800,000. That's the detriment. The subcontractor can't renegotiate its price. What these cases say is the subcontractor's bound. C.G. Schmidt has now walked down the aisle with Primus Delisa from April 2013 to May of 2014. And the last bid in play, which John Stanko says, We are careful when we give you these numbers, because that's our bid in play at the time. And when they're at the altar, and they have this bid, and they lock in with the owner, they can't get jilted by the subcontractor. That's what Jenke stands for. That's what Cedar stands for. That's the law in this circuit. And if there's any question about what the terms were between the parties on the contract claim, or if the reliance was justifiable, that's for the fact finder. That's not for summary judgment. It's stunning when you read the decision that every fact seemed to be construed against the non-movement. And these facts have to be construed in favor of C.G. Schmidt. When you construe the facts in favor of C.G. Schmidt, it's admitted that Primus Delisa wants them to rely on this May 14th bid. It's admitted that Primus Delisa said, Yes, we can start your installation March 1st of 2015. Those are promises that mean something. They're not idle words. Everything that they said after the owner locked in, and Your Honor brings up the issue with a problem of getting materials in Thailand, they never told C.G. Schmidt that. When the equities are considered, Primus Delisa concealed that information from C.G. Schmidt. So the reliance was justifiable, but if there's any doubt about that, at least at the summary judgment stage, you have to have a trial about that. I'd like to reserve some time for rebuttal. Sure. Mr. Slawinski. May it please the Court, foes and counsel. I'm Steve Slawinski, representing the defendant and appellee, Primus Delisa, North America. One of the principal grounds of our position is that there's this longstanding rule of Wisconsin law that says that no contract is formed and no party is bound, where the two parties negotiate with the understanding that their deal, if they should make one, is going to be put down on paper and that they must sign the document before they have a contract. And that's exactly what happened here. So that may be true, but I would like us maybe to start with the promissory estoppel argument, because Mr. Levy argues, and I think this is a very important point, that in the construction industry, there are a lot of players that have to coordinate at the same time. You've got the general dealing with whoever's commissioned the project, we'll call the project owner. You've got any number of subcontractors. The general doesn't really know what a sensible bid is for the owner until the general has a reliable sense of the money that the subcontractors are going to charge. And so you've got to get these moving pieces going in the same direction at roughly the same time, and their argument is that, I guess he's putting his eggs in the May 16, 2014 basket, that that's the point at which Permis de Lisa has said, we will do this project for you for this. And I would say, just in terms of general contract law, if that's the case, then that's the moment at which the risk of loss falls on Permis de Lisa. If they can get Thailand to work, that's great. They can do it for this price. If they can't get Thailand to work, somebody's going to have to eat $800,000, and maybe it's Permis de Lisa. Well, what's going on, we have to keep in mind the backdrop in this particular case. What's different about this case from the cases where promissory estoppel is applied in a subcontract setting is that in those cases, what you have, typically it's a public job, and it moves real fast, and you have a bid by the sub that goes to the general. The general grabs that bid, plugs it into their number, gives that number to the owner. Then the owner, which is typically, again, it's a public owner, they award the project. And presumably it's a firm number, because how would you know what to tell, whether public or private? I don't see why that makes a difference, actually. Well, in this case, we have ongoing negotiations. In this case, we don't have a situation where we have one bid that C.G. Schmidt accepts and then goes to the owner. C.G. Schmidt and Permis de Lisa are engaged in an ongoing negotiation. That's why we have all these revised proposals. This is dickering. This is back-and-forth negotiation, as opposed to Permis de Lisa having given their initial bid in April of 2013 and C.G. Schmidt taking that bid and going and making its deal with the owner. So what language do you think  would want to insist on in one of these bids that would give it the certainty that you think is lacking here? Well, I think it's more an issue of the acceptance by C.G. Schmidt, the communication of the acceptance of the bid by C.G. Schmidt. C.G. Schmidt, on appeal, is hanging their hat on the May 16th because they have to. That's the last updated proposal before they go and sign the G.M.P.A. So they're stuck with that. At no point in time did they turn to Permis de Lisa after having received that revised proposal and saying, done deal, we love it, here's your contract. That's what they could have done. But what do they do? What they do is they send the letter of intent. That's the next thing out of their mouth. And the letter of intent doesn't say, we've got a deal. It says, we'd like to make a deal with you. And we'd like to make a deal with you in the future by signing a contract. And it still has four alternates, right? And they add more alternates, exactly. And as was pointed out in the first round, they continue to negotiate after May 16th. And the numbers are going up and down. This is dickery. This is negotiation. You can't cherry pick an offer as part of the negotiations to base promissory estoppel on it. It's not reasonable reliance to just cherry pick an offer because it happens to have the right date on it and say, I'm going to say I relied on that and I'm going to base my promissory estoppel on that. The parties knew at May 16th that the negotiation wasn't over. They were still negotiating in June. So is it your position that you would need something in the record from CGS that says we're happy with the May 16 proposal? Or something that actually, in so many words, says that's what we're fixing ourselves on? Well, again, Your Honor, I think that some indication of acceptance is required here because that's proof that there was reasonable reliance. But we have this ongoing negotiation that everyone knows isn't over with. And the reason is that there's a parallel set of negotiations going on between C.G. Schmidt and the owner. And that is the backdrop for this whole thing. And that's why C.G. Schmidt wanted this rule that I was talking about to apply. And arguably, they needed it and wanted it more than we did because they wanted to control the point in time in which they could make a contract with Permis de Lisa. They put Permis de Lisa off. They could have issued them a contract back in April of 2013, but they chose not to. When did they issue the contract? June 13. Not April 2013. June 13, 2014. They chose carefully how they wanted to run the deal. And the reason is because their deal with the owner was not a done deal. It was very much in flux. As the district court noted, there were all sorts of contingencies out there, financing, price. They were negotiating with price with their owner all the way to the point where they signed the GMPA in May of 2014, after this May 16. So this is the backdrop. And C.G. Schmidt wants the court to forget about the backdrop that it was to their benefit not to lock and load  and load with the owner. And they weren't going to put the cart before the horse. So I guess the key question is, I mean, we don't want to undo the entire construction trade through this in Wisconsin or anywhere else. So I guess what I'm looking for from you is how in the ordinary situation where subcontracts and the general contract and the owner all have to be coordinated, how do you do that so that somebody doesn't just walk away at the altar, so to speak, as Mr. Levy was saying? Well, I don't think that ruling in favor of premise de lisa causes the end of the world for the construction industry because the facts of this case are different and unique. They are substantially different from the facts of the case in the Yankee case, which was a Seventh Circuit case in which promissory estoppel was applied in a bid context. Substantially different from the Cedar case, which is Wisconsin Court of Appeal. Because here we had the lack of an acceptance and we have the post-bid negotiations. We cite in our brief that post-bid negotiations is the poison pill for promissory estoppel because what you're saying as a general when you start negotiating the bid with the sub is you're saying, I'm not accepting your bid. I want a better deal. And that's what was going on for over a year. My client kept pitching the deal and they kept saying, no, let's tweak this. Can we get the price down a little more? Let's work on this aspect. OK. That spawned the next one and the next one and the next one. Well, you can't say you're relying on a bid when you're rejecting it at the same point in time, which is exactly what they're doing. This is offer and counteroffer. Offer, counteroffer, not offer, acceptance, reliance. Even though this is a 2207 situation? I mean, this UCC transaction. Yes, but I don't see this as a UCC battle of the forms case. And the rule of law that I began to speak about, we cited cases. This applies in both the UCC context and the non-UCC. So I don't think that it makes a difference, frankly, whether the UCC applies or the UCC does not apply because we still have offer, acceptance, offer, or I should say offer, counteroffer, offer, counteroffer, rejection as opposed to offer, acceptance. And so this case is substantially different and it does not create a precedent that will cause a lot of problems for the construction industry going forward. Yeah, they argue that there is an offer and an acceptance and then all of this back and forth is about the question whether the offer is going to be modified because, of course, modifications are not uncommon in construction too. When Permus de Lisa issues its bid in April of 2013, C.G. Schmidt is not ready to walk down the aisle, as my opponent said. It doesn't have a contract with the owner. It doesn't have the owner's permission to enter into a subcontract. It hasn't signed the prime contract. It hasn't signed the GMPA. It made a business decision to wait until those things were in place before it would even consider signing a subcontract. So for C.G. Schmidt to say, we had a deal right when you submitted your first bid, there's no way that can be the case. And, in fact, if you look at the parallel situation, C.G. Schmidt was dealing with the owner The owner had awarded the job to C.G. Schmidt and had chosen C.G. Schmidt just like C.G. Schmidt chose us. But that didn't mean they had a contract with the owner because, just as in our case, a parallel situation, the owner and C.G. Schmidt were saying to one another, no contract till we sign on the dotted line. And C.G. Schmidt did the same thing with us because that's the pickle they were in with the owner. And we can't ignore that when we're looking at this subcontract situation. We can't ignore that backdrop. I think that's crucial in this case. Well, as late as June 13th, the price isn't set, right? There's a change on June 13th. There's no evidence that the price they put into the June 13th contract is a price that Permis de Lisa ever agreed to. First of all, because Permis de Lisa's last word on price was the May 29th, which is a higher price. It's about $8 million and change. And then what C.G. Schmidt does is, three days later, they issue another subcontract, $46,000 lower still. So now we're at $300,000 spread in price is where the parties end up. How can you have a contract when you have a $300,000 price spread? Not only that, but on the 12th of June, we have the parties still negotiating the terms of the contract. We have C.G. Schmidt issuing an addendum on the 12th saying, I'm going to address a couple of your issues. And then privately to one another, internally they're saying, I'm sure they're going to have other issues, but we're going to submit this to them. So they know that this was an ongoing negotiation, and that makes this case different, because it's not reasonable to rely on an ongoing negotiation. You have to have a deal. And that's why this case is different, because in a typical subcontractor, general contractor case, you have one bid, it's accepted, and the general runs with it to the owner. We don't have the general contractor turning to the subcontractor and saying, let's negotiate. Yeah, and in terms of the timing, it was the same day that C.J. Schmidt shared the prime contract with P&A. That was May 29th, right, who shared that? Yes. And then P&A submitted the last bid then. And P&A had said previous to that, we need to see the prime contract, because it's incorporated. Right, because P&A had comments about the prime before it explicitly accepted any bid, right? Yes. I just wanted to make sure. And once C.J. Schmidt incorporated their issues into the draft contract, that's when it was provided as a final draft to P&A for the signature on June 13th. Can you repeat that, please? It was June 13th that the final draft was submitted for P&A's signature. June 13th was the – there were two subcontracts that were prepared by C.J. Schmidt. One was June 13th, one was June 16th. But C.J. Schmidt's document said, our contract with you, P&A, is going to incorporate and include all the terms of the prime contract. Well, they never got us the prime contract until the 29th of May. And from the prior year, Primus Delisa was saying, we've got to see the prime contract because we're buying into the prime contract and we have some issues that we're anticipating might be in that prime contract that doesn't exist yet because you haven't signed it and we haven't seen it, but we're anticipating that there's going to be some issues there, and we need to see that. And how could Primus Delisa be agreeing to a contract that didn't yet exist? And so just in terms of making the distinction, because I'm troubled, as Judge Wood is, to the impact this would have on the construction industry, we don't have letters of intent signed by both parties here. That is true. And so, I mean, just in terms of making a distinction, a principled distinction. Yes, there is. In a lot of the letter of intent cases, what you see is a letter of intent that's prepared by one side and is signed by both sides, and it looks a whole lot like a written contract. What we have here is a unilateral, if you will, letter of intent that is issued by C.J. Schmidt and is not signed by Primus Delisa. They didn't ask us to sign it, and we didn't sign it, and we didn't respond to it. Thank you for your time. I'd ask that the Court affirm the District Court's decision. All right. Thank you very much. Mr. Levy. Your Honors, I hope I can have sufficient time to address many of those statements. What Mr. Slowinski and Primus Delisa are saying is a whole body of facts to distract from how this circuit looks at these cases. This circuit looks at these cases under promissory estoppel primarily, and the only question is, was a definite promise made that the promissory knew could induce reliance? Did it, in fact, induce reliance to the detriment? Those are the facts. There are several misstatements that have been made here. First of all, this was not a back-and-forth negotiation. If you look at page 24 of our reply brief, we have a table for you. There are two primary elements that never changed with the pricing from the first updated bid. The cost of the curtain wall and the credit that would be received for having it produced in Thailand never changed from 2013 to the final contract that was presented to Primus Delisa. There is this discussion that there was a back-and-forth negotiation. It's an absolute red herring. There was no negotiation. There was a period of time, and Primus Delisa admits this. They know the developer is waiting for their financing to come to fruition, and during that process, they're working with architects. Something they say in their own testimony they don't do unless they're under contract. They provide shape drawings. They know that there's this target of getting this building built and commencing work in March of 2015, and so they're doing some pre-construction services. But that was not a negotiation. They admit that alternates in the bid, that can become a contract. You can have a contract with 20 alternates. That's in their admissions and their testimony. Even when you have a construction contract, there's frequently change orders. So the idea that there was a negotiation is an absolute red herring. There was a comment that their offer was never accepted. That's wrong. The bid that they provided in April of 2013, it's undisputed, was accepted. In their moving papers for summary judgment, they say Primus Delisa was awarded the work, and after they were awarded the work, as Your Honor said, there was a series of discussions for a modification. What they were doing was they were saying, that bid you gave us in April of 2013, after your law department looked at the bid invite, and the bid invite said, you have to sign our subcontract agreement. And the subcontract said, it incorporates the prime contract. And now counsel says those were uncertain terms. That's at their peril. They had their law department review the bid form. We have put in our materials, they have exclusions and exceptions in their bid. None of them say, we are making this contingent on reviewing the prime contract. None of their exclusions or exceptions, which their law department helped them create, said, we're not letting you be bound by this bid, or we won't be bound by this bid until things happen. So that bid that they made was accepted. That could have become the contract, and on day two there would have been change orders. But the bid was, they admit it was awarded to them. There was no negotiation. You need to wrap up. I just have one question. What about P&A repeatedly expressing a desire to execute a final written contract and the request for two separate letters of intent from C.G. Schmidt, which they never got? They got two letters of intent from C.G. Schmidt, and they didn't ask for a signature. And what they were saying at that time was for us to continue with these pre-construction engineering services. They wanted to know, everyone knew that this wouldn't go forward to a subcontract unless the project went forward. But they were being asked to perform work before it was certain the project would go forward. So they said, pay us for that. And the mechanism to pay them was the letter of intent. Another red herring. Which was not signed? Excuse me? Which was not signed? It was signed by C.G. Schmidt. They didn't request a signature. The first one wasn't signed. I think only the second one was signed. I don't recall the first one being signed or not. But it was delivered by C.G. Schmidt, and the second one was. . . And the May 27th date that they locked in with their guaranteed maximum price. But they didn't know it would lock in on May 27th. The most important thing is that this happened on summary judgment. There needs to be a trial of these facts. It's fact intensive. And it does have ramifications for the construction industry. Okay. I think we have your point. So thank you very much. Good afternoon. Thanks to both counsel. We'll take the case under advisement.